## MOSER & HEIDENHEIMER MALTING COMPANY, Appellant, *v.* GEORGE LAWRENCE and Another, Respondents.

*Order of arrest granted in the fifth judicial district — motion to vacate denied, with leave to renew it at Special Term — what court has jurisdiction to hear the renewal motion when the venue is in the first judicial district — Code of Civil Procedure, sec. 769 — bail.*

An order of arrest was granted in an action, the place of trial of which was the county of New York, by a justice in Onondaga county. The defendants moved in that county before said justice, without notice, and subsequently, on notice to the plaintiff, to vacate such order. Both motions were denied. Upon the last motion, papers other than the original ones were used, and the motion was denied "without prejudice to defendants' right to renew the same at Special Term."

A renewal of the motion was made and heard in the county of Onondaga in the fifth judicial district.

*Held,* that the place of trial being in the first judicial district, and the justice having directed the renewal motion to be heard "at Special Term," no court, other than one held in the first judicial district had jurisdiction to hear such motion.

The amount of bail which may be properly required in a civil action, considered by Van Brunt, P. J.

Appeal by the plaintiff, the Moser & Heidenheimer Malting Company, from an order, entered in the clerk's office of the county of New York, vacating an order of arrest granted, in the above-entitled action, on the 5th day of February, 1891, and directing the discharge of the defendants from arrest under said order.

*Louis Marshall,* for the appellant.

*W. S. Andrews,* for the repondents.

Daniels, J.:

The order of arrest was made by Mr. Justice Kennedy, and that entitled the defendants to move before him as such justice, without notice, and, also, with notice to the plaintiffs to vacate it. (Code Civ. Pro., § 568.) They made each of those motions, and they were denied by Justice Kennedy. In the denial of the last motion the order directed that it was "without prejudice to defendants' right to renew the same at Special Term." The section just referred to did not provide for the making of that motion at a Special Term held in his own district, or by Justice Kennedy. It authorized him,

at a Special Term held by himself, to hear and decide an application to vacate the order on the papers on which it was granted. That could be made either with or without notice. But when made in either mode, the application was to be heard only on the papers on which the order was founded. When the application proceeded upon proof by affidavit on the part of the defendants, then this section has authorized it to be made to the court itself, or to any judge of the court. If made to the court, it has not been provided that it can be made to any court, or to the court held in the district in which the order has been made. But that has been left subject to other provisions declaring to what court the motion may be addressed. That was the final condition in which this action was left by the order, that the motion was to be made at a Special Term. And when a motion is to be made at the Special Term, section 769 of this Code has declared where it shall be made. That is, at a court held in the district or a county adjoining the district in which the action is triable. But when the action is triable in the first judicial district, then the motion must be made there.

The place of trial in this action is the county of New York, forming the first judicial district. The action was there triable, therefore; and as the motion to discharge the order of arrest was to be made only at Special Term by the order which Justice Kennedy finally made, and under which the motion was brought on, it should have been made in the first district.

So much of the order of Justice Kennedy as permitted the renewal of the motion, is free from all possible ambiguity. It was to be at Special Term, and that included only the Special Term having the power under the law to hear it. And as no Special Term out of the first judicial district had that power, it follows that the Special Term held in the city of Syracuse, which is in the fifth judicial district, and which heard and decided the motion, was without that authority. And the case of *Sutton* v. *Sabey* (22 Hun, 557), fully sustains this construction of the law. The order vacating the order of arrest was accordingly made without jurisdiction over the subject, and should, without considering the merits, be reversed, with ten dollars costs and the disbursements.

Lawrence, J., concurred.

VAN BRUNT, P. J.:

It appears that the order of arrest in question was originally granted by Mr. Justice KENNEDY, and a motion made to vacate the order upon the papers upon which it was granted before him, which motion was denied without prejudice to a renewal. The second motion was made before Mr. Justice KENNEDY upon the papers upon which the order was granted and certain additional affidavits. This motion was also denied upon the merits without prejudice to defendant's right to renew it at Special Term. A third motion was then made before the same judge at the Onondaga Special Term, although the venue of the action was laid in New York county. The plaintiff objected to the hearing of the motion out of the first judicial district on the ground that the action was triable in said district. This objection was overruled by the court, and it thereupon, notwithstanding such objection, proceeded to hear the motion. It is now urged upon this appeal that the objection was well taken.

It is undoubtedly true that all motions in cases in the first judicial district must be made in that district; but as the motion in question was not a motion of right, but leave to make the same had been granted as a favor, the court making the order had a right to prescribe that the motion might be made elsewhere than in the district in which the case was triable.

It is true the phraseology of the order does not necessarily bear this construction, but it having been so interpreted by the judge who made the same, it undoubtedly was his intention to allow the motion to be made before him at Special Term, and with his interpretation of his own order we do not think we ought to interfere.

This action was one of replevin to recover possession of 23,899 bushels of malt made of New York and western barley. Upon the usual affidavits and undertaking, a requisition was issued to the sheriff of Onondaga and Madison counties to replevin the same. Both sheriffs made return that they could not take the property since it had been eloigned, sold, removed and disposed of. The plaintiff thereupon amended its complaint by setting forth the fact that the malt had been sold, removed and disposed of by defendants so that the same and no part thereof could be found and taken by the sheriff, with the intent that it should not be so found and taken, and to deprive the plaintiff of the benefit thereof.

The defendants answered this complaint, alleging an agreement between the plaintiff and defendants to malt for it 50,000 bushels of barley, and deliver such malt to the plaintiff, and that they performed this agreement according to its terms, and subsequently malted for the plaintiff about 30,000 bushels of barley, and that they remained indebted to the plaintiff in the sum of $4,500, and prayed judgment that the complaint might be dismissed, except so far as to allow the plaintiff to take judgment against them for the sum of $4,500, with costs. Subsequently plaintiff procured an order of arrest against both defendants, upon the ground that the defendants had removed the chattels sought to be recovered in the action with intent that they should not be found or taken, and depriving the plaintiff of the benefit thereof. A motion to vacate said order, as above mentioned, was made, and from the order finally vacating the order of arrest this appeal is taken.

It appeared that on the 22d of October, 1889, the defendants entered into a contract with the plaintiff, whereby they agreed to malt, during the season of 1889–90, fifty thousand bushels of barley for the plaintiff in their malt-houses, situate at Manlius and Canastota, upon the following terms : The charge for malting to be ten cents per bushel upon the cost-price of the barley, plaintiff to receive the entire amount of the malt (including increase) made from the barley purchased for them at the cost of the barley, and ten cents advance on said cost, the malt to be delivered free of all charges, whether for lighterage or terminal charges at New York or Brooklyn. The defendants agreed to make drafts at three months, without interest, for the amount they paid for the barley, and they also agreed to effect insurance on all barley purchased for the plaintiff, and the malt on hand made from such barley, said insurance policies to be made for and in the name of the plaintiff. They also agreed not to draw for more than four cents per bushel above cost-price of barley for necessary running expenses of their malt-house. This contract seems to have been entirely fulfilled, and on the 21st of January, 1890, the plaintiff telegraphed the defendants as follows : "Do not buy any more barley, as this completes our contract; will not accept more." And on the same day wrote as follows: "We received statement showing that you bought 50,700 bushels of barley. As this is more than our contract calls for, you will please not buy another

bushel, as we will not accept any more." On the twenty-second of January plaintiff wrote another letter in which it says : " You may continue buying for malting for us until we let you know to stop, but you must not buy any western, as we will not accept it," etc.

It further appeared that subsequently a large quantity of western barley was delivered to and received by the defendants at Manlius and Canastota, a portion of which was paid for by money raised on drafts upon the plaintiff, who was informed of said purchase, and the balance was paid by the defendants accepting drafts drawn on them, which were not paid, and judgment on said drafts was subsequently obtained against the defendants, amounting in the aggregate to the sum of over five thousand dollars. On the 3d of March, 1890, the plaintiff wrote to the defendants to ship ten car loads of malt, half western, thus showing that it had ratified the purchase of the western barley and had receded from its instructions to the defendants not to purchase any such barley.

It further appears that the defendants had disposed of a large quantity of malt to other parties, which the plaintiff claimed to have been part of the malt belonging to it and made out of barley purchased by the defendants with its money. The learned judge below based his decision upon the ground that the plaintiff did not secure to itself the title of the barley bought and malted after the new or substituted agreement on January 22, 1890, because by its terms the defendants had no authority to purchase and malt for the plaintiff any western barley, and that the title of the western barley bought by the defendants after the making of the new agreement did not, therefore, vest in the plaintiff, even though the same had been wholly paid for by money raised from drafts accepted by it ; that if the plaintiff furnished money to the defendants with instructions to purchase New York State barley only, and with the distinct prohibition against buying western barley, and the defendants appropriated the money, in whole or in part, to buy the prohibited barley, the title to that would not vest in the plaintiff until it had actually received the malt made therefrom by delivery to it, and thereby ratified the unauthorized act.

We think that the learned judge has overlooked the fact that the prohibition contained in the contract of January twenty-second was waived, and that the defendants reported to the plaintiff the purchase

of western barley, and that the plaintiff authorized the purchase of western barley, and that such barley came under the terms of the contract of October precisely the same as State barley purchased by the defendants for the plaintiff.

It is true that a portion of this western barley was bought by the defendants on their credit, and which they have not paid for. But the plaintiff did not lose the title to its property because the defendants have so confused it with their own, which they had no right to do, that its identity could not be traced.

It seems to us, when we take into consideration the fact that the prohibition against the purchase of western barley had been withdrawn, that the claim that the title to the barley purchased by the money of the plaintiff did not vest in the plaintiff cannot be sustained.

Now, it is clear from the evidence that the defendants have disposed of malt which the plaintiff would have had a right to take in this proceeding had they found it in the possession of the defendants. It is clear, from the nature of the contract of October, 1889, that it was the understanding of the parties that the title to this barley should be in the plaintiff, as also in the malt made therefrom. It was the plaintiff's money that was paid for it. The only additional money which the defendants were to get was the ten per cent as compensation for malting the barley. The barley was to be insured in the name of the plaintiff, a very clear indication as to where the parties understood the title of the barley to be. If the defendants violated the instructions of the plaintiff in the purchase with their money of merchandise different from that which they were authorized to purchase, as between the plaintiff and the defendant, the plaintiff had a right to ratify the purchase and claim the property which had been bought by their agents with their money.

But it is not necessary to resort to any principle of this description, as it is clear, as already stated, that the prohibition against the purchase of western barley had been withdrawn; the purchase had been recognized and the title to the western barley, bought with the money of the plaintiff, passed to the plaintiff. We think, therefore, that the learned judge in the court below erred in coming to the conclusion that no title to any of this western barley passed

to the plaintiff; and as considerable of the malt eloigned was produced from western barley, that, therefore, no order of arrest should have been granted.

But we think that the amount of bail required in the order of arrest was excessive. It seems to have been assumed by the learned judge in the court below that there is some difference in the object of giving bail in a civil and criminal suit, for he says: "Upon the trial of an indictment for any crime * * * the accused party is entitled to bail not excessive, but for his personal appearance only. Upon this order of arrest (in a civil action), bail of this character is not available to the defendants, but instead that required is beyond their ability to furnish," etc.

We had supposed that all that bail in a civil action was given for, was, to secure the appearance of the defendant in answer to the execution against his person, and that bail is given in a criminal action for the purpose of securing the appearance of the defendant at the trial of the indictment and subjecting himself to the judgment of the court — precisely the same thing.

Now, since the virtual abolition of imprisonment for debt, making the longest term of imprisonment less than that which would be imposed on an indictment for misdemeanor, bail in a civil action should be in some degree proportioned to the penalty which might be inflicted on the defendant who has become subject to arrest, and does not depend upon the amount of the claim, because, be the claim great or small, the defendant cannot be imprisoned as long as he might be upon conviction upon an indictment for almost any kind of misdemeanor.

We think, therefore, that the order appealed from should be reversed, with ten dollars costs and disbursements.

Order reversed, with ten dollars costs and disbursements.